**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| City of Saint Paul, | Court File No. 25-CV-04098 (PJS/SGE) |
| Plaintiff, | |
| v. | **ANSWER AND COUNTERCLAIM of BLACKFEM, INC.** |
| BlackFem, Inc., The 10Seven Project, Inc., and 10Seven, LLC, | |
| Defendants. | |

In Answer to the Complaint served by the City of St. Paul, BlackFem, Inc., denies each allegation except as admitted below. In further answer, BlackFem states and alleges as follows:

## PARTIES

1.      The City of Saint Paul is a municipal corporation organized and existing under the laws of the State of Minnesota. Saint Paul is a first-class city.

**Answer:** BlackFem admits the allegations in Paragraph 1.

2.      Upon information and belief, Defendant BlackFem, Inc. is a not-for-profit corporation organized and existing under the laws of the State of New York, with its principal place of business at 6 Puritan Ct., Damascus, Maryland, 20872. Upon information and belief, Chloe McKenzie is the founder and CEO of BlackFem.

**Answer**: BlackFem admits the allegations in Paragraph 2, except to state that BlackFem's principal place of business address is 9701 New Church St Suites C and D Damascus, MD 20872.

3.      Upon information and belief, 10Seven, LLC is a limited liability company

1

organized and existing under the laws of the State of Maryland, with its principal place of business at 21030-G Frederick Road, Germantown, Maryland, 20876. Upon information and belief, Chloe McKenzie is the founder and CEO of 10Seven, LLC.

> **Answer**: BlackFem admits the allegations in Paragraph 2, except to state that 10Seven, LLC's principal place of business address is 9701 New Church St Suites C and D Damascus, MD 20872.

4.      Upon information and belief, The 10Seven Project, Inc. is a not-for-profit corporation organized and existing under the laws of the State of Maryland, with its principal place of business at 9841 Washingtonian Blvd, Ste. 200, Gaithersburg, MD 20878. Upon information and belief, Chloe McKenzie is the founder and CEO of The 10Seven Project, Inc.

> **Answer**: BlackFem admits the allegations in Paragraph 2, except to state that 10Seven, LLC's principal place of business address is 9701 New Church St Suites C and D Damascus, MD 20872.

## JURISDICTION AND VENUE

5.      This court has jurisdiction, and venue is proper, because the terms of the contract at issue require litigation in Ramsey County District Court, and pursuant to Minn. Stat. 542.09 because the cause of action stated herein arose in Ramsey County.

> **Answer**: BlackFem states that the United States District Court for the District of Minnesota has jurisdiction over the contract dispute between the City and BlackFem and that venue is proper. BlackFem denies that the terms of the contract between the City and BlackFem "require litigation in Ramsey County District Court," and state that under Section 16(a) of the contract, the parties agreed to venue in either Ramsey County District Court or the United States District Court for the District of Minnesota.
>
> BlackFem further states that neither The 10Seven Project, Inc. nor 10Seven, LLC is a party to any contract with the City, that neither is subject to the contract's choice of venue provision, and that the City's Complaint

2

does not allege any basis for the exercise of personal jurisdiction over either The 10Seven Project, Inc. or 10Seven, LLC.

## FACTS COMMON TO ALL COUNTS

6.      On January 1, 2020, the City's Office of Financial Empowerment ("OFE") launched CollegeBound Saint Paul ("CollegeBound"), a new initiative that provides every child born in the City with a college savings account seeded with $50.

> **Answer**: BlackFem admits the allegations in Paragraph 6 on information and belief.

7.      CollegeBound is more than a savings account; it is a citywide program aimed at illuminating a pathway to a brighter future by connecting kids and families to financial services and education and promoting a citywide college-going culture.

> **Answer**: BlackFem admits the allegations in Paragraph 7 on information and belief.

8.      The first cohort of CollegeBound enrolled students entered kindergarten in 2025.

> **Answer**: BlackFem admits the allegations in Paragraph 8 on information and belief.

9.      In 2024, CollegeBound released its Elementary Blueprint (the "Blueprint"), a set of community-created recommendations for implementing CollegeBound's vision. One of three goals the Blueprint focused on was whole family wealth literacy. The Blueprint envisioned teaching wealth literacy for the whole family through three approaches: (1) in schools, (2) after school, and (3) in the community.

> **Answer**: BlackFem admits the allegations in Paragraph 9 on information and belief. BlackFem further affirmatively states that the Blueprint acknowledges at page 46 that its section on wealth literacy "was envisioned

3

and adapted based on conversations with and presentations by Chloe B. McKenzie at BlackFem, who coined the concept and practice of wealth justice."

10.     On February 7, 2024, the City issued a Request for Proposal (the "RFP") to, among other things, find a consultant to develop in-school, after-school and in-community wealth literacy curriculum (the "Curriculum") for the City, Saint Paul Public Schools ("SPPS"), and the City's community partners (the "Community Partners") to teach CollegeBound students and their families.

**Answer**: BlackFem admits the allegations in Paragraph 10 on information and belief.

11.     BlackFem responded to the RFP. The City and BlackFem entered into a professional services agreement (the "Agreement") and scope of work (the "SOW") (together, the "Contract"), with an effective date of August 5, 2024. The Contract is attached hereto as Exhibit A.

**Answer**: BlackFem admits that BlackFem responded to the RFP, and that BlackFem and the City entered the Contract. BlackFem affirmatively states that though the Contract states it had an effective date of August 5, 2024, the City did not provide BlackFem with a final version for signature until September 4, 2024. BlackFem denies that a copy of the Contract was attached to the summons and complaint.

12.     Pursuant to the Contract, the City agreed to pay BlackFem $1,000,000 in exchange for working with the City, SPPS and the Community Partners to develop the Curriculum and provide other services and deliverables detailed in the SOW.

**Answer**: BlackFem states that the Contract speaks for itself, and denies the allegations in Paragraph 12 to the extent they misstate the Contract's terms. BlackFem admits that under the Contract, the City agreed to pay BlackFem $1,000,000 in consideration for BlackFem's performance of its contractual obligations.

13.    The Contract expires on December 31, 2026.

**Answer**: BlackFem admits the allegation in Paragraph 13.

14.    Chloe McKenzie signed the Contract on behalf of BlackFem.

**Answer**: BlackFem admits the allegation in Paragraph 13.

15.    Mirroring the Blueprint, the SOW details the development of the Curriculum for three discrete programs: (1) the "In-School Program" to be implemented in partnership with SPPS; (2) the "In-Community Program" to be implemented in partnership with the Community Partners; and (3) the "After-School Program" to be implemented in partnership with after-school partners at the City and SPPS.

**Answer:** BlackFem states that the Contract speaks for itself, and denies the allegations in Paragraph 15 to the extent they misstate the Contract's terms.

16.    In several places, the SOW states that the work will be completed by "BlackFem/10Seven Project."

**Answer**: BlackFem states that the Contract speaks for itself, and denies the allegations in Paragraph 16 to the extent they misstate the Contract's terms. BlackFem affirmatively states that The 10Seven Project is not a party to the Contract.

17.    The Contract sets out terms regarding ownership of the work created thereunder. Section 8A states: "All work products and supporting documentation must be delivered to the City, and will become the property of the City after final payment is made to the Contractor with no right, title, or interest in said work products or supporting documentation vesting in Contractor, except as provided in this section."

**Answer**: BlackFem states that the Contract speaks for itself, and denies the allegations in Paragraph 17 to the extent they misstate the Contract's terms. BlackFem affirmatively states that Paragraph 17 selectively quotes from the

Contract. Section 8(A) states in full: "All work products and supporting documentation must be delivered to the City, and will become the property of the City after final payment is made to the Contractor with no right, title, or interest in said work products or supporting documentation vesting in Contractor, except as provided in this section. Contractor retains the right to all its software, intellectual property and templates that are not a Service specific deliverable as well as to individual features of the design which Contractor would reasonably expect to be able to recreate in whole or in part in other projects. Contractor is not liable for any unauthorized use or reuse of any plans or specifications by the City or any third party."

18.    From the start of the Contract, BlackFem made up excuses for performance and failed to meet deadlines identified in the SOW. Passionate about the goals of the project, OFE worked with BlackFem despite the delays.

**Answer**: BlackFem denies the allegations in Paragraph 18.

19.    BlackFem issued two invoices, on September 9, 2024 and April 1, 2025, for $500,000 and $400,000 respectively. The City paid these invoices.

**Answer**: BlackFem admits the allegations in Paragraph 19.

20.    In June 2025, contrary to the terms of the Contract, BlackFem informed OFE that when the Contract expires, none of the Curriculum that they have developed for any of the three programs would be available to the City or its partners unless the City paid an ongoing fee to BlackFem.

**Answer**: BlackFem denies the allegations in Paragraph 20.

21.    After reiteration of the terms of the Contract, BlackFem's counsel relented in a July 16, 2025, letter, indicating that at the end of the Contract the Curriculum would be provided to the City in locked pdf format, but that BlackFem would not allow "any … public dissemination… without [BlackFem's] prior written consent."

6

**Answer**: BlackFem admits that BlackFem's attorney confirmed to the City, consistent with the terms of the Contract, that at the end of the Contract term, the City will be provided with the work product developed under the Contract in a locked PDF format and admits that BlackFem, as owners of the underlying copyrights, would not permit the City to disseminate the work product without written consent. To the extent Paragraph 21 is intended to imply that the statements in the July 16, 2025, letter were a change in BlackFem's position or that the City is entitled under the Contract to disseminate the Curriculum, such allegations are denied.

22.     BlackFem described the Curriculum instead as "materials for *internal* educational purposes."

**Answer**: BlackFem denies the allegation in Paragraph 22, and affirmatively states that the isolated quotation misrepresents the contents of the July 16, 2025 letter.

23.     This condition mean the lesson plans could never be shared with the City's partners and could not be used to teach wealth literacy to CollegeBound students or families.

**Answer**: BlackFem denies the allegations in Paragraph 23 and affirmatively states that the City's rights to share and use the work product created by BlackFem are governed and limited by the terms of the parties' contract and copyright law.

24.     In the July 16, 2025, letter BlackFem's counsel offered, "If the City prefers to terminate the Agreement at this stage without further obligation, my client will not object."

**Answer**: BlackFem admits the July 16, 2025 letter contains the quoted sentence.

25.     The letter did not include an offer to refund any of the $900,000 paid to BlackFem to date.

**Answer**: BlackFem admits the allegation in Paragraph 25.

7

26.     The City refused to agree with BlackFem regarding ownership and use rights of the Curriculum and refused to terminate the Contract.

> **Answer**: BlackFem admits the allegation in Paragraph 26, and affirmatively states that the Contract did not transfer ownership of BlackFem's or any other party's intellectual property to the City.

27.     On August 25, 2025, Chloe McKenzie sent letters to SPPS and the Community Partners threatening that any use of the Curriculum "could expose [the Community Partners'] institution to potential legal liability."

> **Answer**: BlackFem admits McKenzie sent letters to St. Paul Public Schools and other Community Partners on August 25, 2025. BlackFem denies the letters made any threats, and denies the allegations in Paragraph 27 to the extent they contradict or mischaracterize the contents of McKenzie's letter.

28.     Concerned about relationships with its partners, the City sent Defendants' counsel a Cease-and-Desist Letter on August 27, 2025, demanding that McKenzie and BlackFem stop contacting partners about issues related to the dispute and retract its previous communications.

> **Answer**: BlackFem admits that it received the Cease-and-Desist Letter referenced in Paragraph 28. BlackFem states that the contents of the letter speak for themselves and denies any allegations in Paragraph 28 to the extent they mischaracterize the letter.

29.     On September 3, 2025, BlackFem's counsel responded, stating: "BlackFem will not be silenced by the City and will not rescind or retract any communications to CollegeBound partners."

> **Answer**: BlackFem admits the September 3, 2025, letter contains the quoted statement. BlackFem denies any allegation contained in Paragraph 29 that suggests the letter constitutes an admission or otherwise concedes any claims made by the City.

30.     As the disagreement escalated, Defendants manufactured excuses, including pointing to this dispute, to avoid its obligations under the Contract.

> **Answer**: BlackFem denies the allegations in Paragraph 30.

31.     For example, on August 25, 2025, McKenzie sent an email to SPPS stating: "Unfortunately, now we will have to schedule for something some time after 9/5 because of a contractual issue with the City."

> **Answer**: BlackFem admits that on August 25, 2025, McKenzie sent an email to St. Paul Public Schools, and that the email contains the quoted statement. BlackFem denies that the email breached the Contract.

32.     On September 10, 2025, McKenzie sent an email to OFE stating: "As mentioned, at this time, there are a few outstanding logistical and contractual matters that need to be addressed before we're able to move forward with additional program discussions. We'll need to table any further substantive planning until those matters are resolved."

> **Answer**: BlackFem denies the allegation in Paragraph 32, and affirmatively states that the quoted statement was in an email that Deniece Roahrig, BlackFem's Chief Operating Officer, sent on July 25, 2025.

33.     On September 19, 2025, the City sent a letter to BlackFem's counsel entitled "Notice of Breach and Demand to Cure."

> **Answer**: BlackFem admits the allegation in Paragraph 34.

34.     In the September 19 letter, the City identified the following breaches of contract:

> 1. **Lesson Plans:** Under page 12 of the Contract, BlackFem was required to complete and deliver the Saint Paul Public Schools ("SPPS") PLP Lesson Plans ("Lesson Plans") work products by

9

December 2024. Despite BlackFem's August 20, 2025, assurance that the Lesson Plans were "ready to deliver," the City has not received any of the SPPS PLP Lesson Plans.

2. **Monitoring and Evaluation Plan; Messaging Toolkit:** Under page 14 of the Contract, BlackFem was required to deliver both the monitoring and evaluation plan and the messaging toolkit by March 2025. BlackFem has delivered neither.

3. **In-School Learning Platform:** Under page 14 of the Contract, BlackFem was required to provide the City with access to a fully finalized learning platform (the "In-School Platform"), including the following work products: finished lesson plans, student-facing materials, caregiver-facing materials, and supplemental materials by March 2025. BlackFem has only granted access to the In-School Platform to two SPPS staffers and the In-School Platform does not contain the finished lesson plans, student-facing materials, or caregiver- facing materials.

4. **In-Community Learning Platform:** Under page 15 of the Contract, BlackFem was required to provide access to the learning platform for participating caregivers and community partners (the "In-Community Platform") by January 2025. BlackFem did not provide the In- Community Platform to the City by this deadline. BlackFem did agree to walk the City through this tool on August 29, 2025, however, BlackFem cancelled this meeting, and has not provided the City with access to the In-Community Learning Platform.

**Answer**: BlackFem admits the City's September 19, 2025, letter contained the statements set out in Paragraph 34. BlackFem denies the allegations made in those statements.

35.   The City gave BlackFem until October 24, 2025 to cure the identified breaches.

**Answer**: BlackFem admits the City's September 19, 2025, letter stated that the City was giving BlackFem until October 24, 2025, to cure the alleged breaches. BlackFem denies that there were any breaches to cure.

36.   On September 24, 2025, BlackFem's counsel sent a letter denying the

identified breaches and demanding that the City terminate the Contract by September 26, 2025.

> **Answer**: BlackFem admits that on September 24, 2025, BlackFem's attorney sent the City a letter setting forth a detailed refutation of the City's claim that BlackFem had breached the contract.

37. The September 24 letter states, in part:

> [M]y client no longer believes a continuing relationship with the City is tenable…There is no productive purpose served by "curing" by October 24, 2025, holding further meetings under these circumstances, or continuing the Contract through December 2026. Accordingly, my client requests that the City terminate the Contract no later than **September 26, 2025** …There is no point in holding the October 2, 2025 training session.

> **Answer**: BlackFem states that Paragraph 37 contains a selective quotation from one paragraph of the September 24 letter. The paragraph states in full:

> "That said, my client no longer believes a continuing relationship with the City is tenable. The City's unsubstantiated threats of breach, coupled with mischaracterizations of my client's intellectual property rights and role under the Scope of Work, have eroded all confidence in collaboration. There is no productive purpose served by "curing" by October 24, 2025, holding further meetings under these circumstances, or continuing the Contract through December 2026. Accordingly, my client requests that the City terminate the Contract no later than September 26, 2025, so as to not cause even more confusion or difficulty to SPPS and other community organizations. There is no point in holding the October 2, 2025 training session if the City's goal is just to make more claims that my client is defaming the City or acting in bad faith simply by stating ownership over its own intellectual property."

38. The letter did not include an offer to refund any of the $900,000 paid to the BlackFem to date.

> **Answer**: BlackFem admits the allegation in Paragraph 38, and denies that any refund is owed to the City.

39. The October 2, 2025, training referenced by Defendants is identified as a

deliverable in the SOW as the "Teacher Academy" and was designed to provide SPPS counselors with instruction on the Curriculum. Because SPPS counselors have extremely limited professional development time, October 2 was the only date available to hold the Teacher Academy prior to May 2026. Accordingly, the Teacher Academy had to occur on October 2; otherwise, the Curriculum could not be delivered to CollegeBound kindergartners during the 2025–2026 school year.

> **Answer**: BlackFem admits the training is identified as a deliverable in the Statement of Work, and otherwise denies the allegations in Paragraph 39.

40. On September 30, 2025, two days before the Teacher Academy, Chloe McKenzie emailed SPPS staff and informed them, with no explanation provided, that the Training would "not be moving forward."

> **Answer**: BlackFem admits McKenzie sent an email to St. Paul Public Schools staff on September 30, 2025, informing them that the training would not proceed on October 2, and otherwise denies the allegations in Paragraph 40.

41. Defendants have thus clearly refused to perform their remaining obligations under the Contract.

> **Answer**: BlackFem denies the allegations in Paragraph 41.

42. The City has suffered financial and reputational harm by Defendants' failure to perform the terms of the Contract.

> **Answer**: BlackFem denies the allegations in Paragraph 42.

43. The City has spent $900,000 on a product it has not received and cannot use without threat of litigation from Defendants.

> **Answer**: BlackFem denies the allegations in Paragraph 43.

44.    McKenzie's and BlackFem's August 25 communications with the City's partners harmed the City's relationships with SPPS and Community Partners.

**Answer**: BlackFem denies the allegations in Paragraph 44.

45.    Implementation of the CollegeBound wealth literacy curriculum has been set back by at least a year, due to Defendants' failure to perform, causing the City's first cohort of CollegeBound students to miss out on kindergarten programming.

**Answer**: BlackFem denies the allegations in Paragraph 45.

46.    Due to Defendants' failure to perform, the City is now forced to seek a new consultant and/or curriculum to complete the work it has already paid Defendants to perform.

**Answer**: BlackFem denies the allegations in Paragraph 41.

## COUNT I
## BREACH OF CONTRACT BY REPUDIATION

47.    The City restates and realleges all previous paragraphs of this pleading.

**Answer**: BlackFem incorporates its responses to the previous paragraphs.

48.    The Contract constitutes a valid and enforceable contract between the City and Defendants.

**Answer**: BlackFem admits that the Contract constitutes a valid and enforceable contract between the City and BlackFem. BlackFem denies that the Contract constitutes a valid and enforceable contract between the City and The 10Seven Project, Inc. or 10Seven, LLC.

49.    Defendants agreed to perform pursuant to the Contract through December 31, 2026.

**Answer**: BlackFem states that the Contract speaks for itself, and denies the allegations in Paragraph 49 to the extent they contradict or are inconsistent

13

with the Contract's stated terms or include The 10Seven Project, Inc. or 10Seven LLC as parties to the Contract.

50.    The City paid invoices provided by Defendants in the amount of $900,000.

**Answer**: BlackFem admits the City paid the invoices issued by BlackFem, and denies that either of the other Defendants sent an invoice to the City.

51.    The invoice payments preceded Defendants' performance of the Contract.

**Answer**: BlackFem denies the allegations in Paragraph 51. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

52.    Defendants repudiated the Contract by sending the September 24, 2025, letter stating, clearly and without qualification, that Defendant did not intend to perform its obligations under the Contract and demanding that the City terminate the Contract early.

**Answer**: BlackFem denies the allegations in Paragraph 52. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

53.    Defendants further repudiated the Contract on September 30, 2025, by cancelling the Teacher Academy and stating that it "will not be moving forward."

**Answer**: BlackFem denies the allegations in Paragraph 53. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

54.    Defendants' repudiation of the Contract has caused, and will continue to cause, harm to the City as described herein.

**Answer**: BlackFem denies the allegations in Paragraph 54. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

55.    As a direct and proximate result of Defendants' breach of the Contract by

repudiation, the City is entitled to damages in an amount to be proven at trial but reasonably believed to be in excess of $50,000.

>**Answer**: BlackFem denies the allegations in Paragraph 55. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

## COUNT II
## BREACH OF CONTRACT

56. The City restates and realleges all previous paragraphs of this pleading.

>**Answer**: BlackFem incorporates its responses to the previous paragraphs.

57. Defendants breached the terms and conditions of the Contract by, among other things:

>a. Failing to deliver lesson plans to the City by December 2024;
>b. Failing to deliver a monitoring and evaluation plan and messaging toolkit by March 2025;
>c. Failing to provide the City and SPPS access to a fully finalized learning platform for the In-School Program by March 2025; and
>d. Failing to provide the City and the Community Partners access to a fully finalized learning platform for the In-Community Program by January 2025.

>**Answer**: BlackFem denies the allegations in Paragraph 57. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

58. Pursuant to the Contract, on September 19, 2025, the City notified Defendants of the above-stated breaches and provided an opportunity to cure by October 24, 2025.

>**Answer**: BlackFem admits the City sent the September 19, 2025, letter, and denies the allegations that BlackFem breached the contract. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

59.    Defendants refused to cure these breaches by letter dated September 24, 2025.

**Answer**: BlackFem denies the allegations in Paragraph 59. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

60.    Defendants further breached the Contract on September 30, 2025 by cancelling the Teacher Academy that had been set for October 2, 2025.

**Answer**: BlackFem denies the allegations in Paragraph 60. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

61.    Defendants' breach of the Contract has caused, and will continue to cause, harm to the City as described herein.

**Answer**: BlackFem denies the allegations in Paragraph 61. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

62.    As a direct and proximate result of Defendants' breach of the Contract, the City is entitled to damages in an amount to be proven at trial but reasonably believed to be in excess of $50,000.

**Answer**: BlackFem denies the allegations in Paragraph 62. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

**COUNT III**
**BREACH OF THE IMPLIED**
**COVENANT OF GOOD FAITH AND**
**FAIR DEALING**

63.    The City restates and realleges all previous paragraphs of this pleading.

**Answer**: BlackFem incorporates its responses to all previous paragraphs.

64.    Every contract, including the Contract between the City and Defendants

16

includes the implied covenant of good faith and fair dealing.

> **Answer**: Paragraph 64 sets forth an assertion of law to which no responsive pleading is required.

65.    The implied covenant of good faith and fair dealing prohibits parties to a contract, such as Defendants in this case, from evading the spirit of the bargain and interfering and hindering the other party's performance.

> **Answer**: Paragraph 65 sets forth an assertion of law to which no responsive pleading is required. BlackFem denies they breached the duty of good faith and fair dealing, and affirmatively state that the only parties to the Contract are the City and BlackFem.

66.    Defendants violated the implied covenant of good faith and fair dealing by, among other things, evading the spirit of the bargain. The Contract clearly provides, that the City must implement the Curriculum through SPPS and Community Partners. Stating that the City cannot provide the Curriculum to those organizations, contradicts this clear purpose and understanding.

> **Answer**: BlackFem denies the allegations in Paragraph 66. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

67.    Defendants violated the implied covenant of good faith and fair dealing by, among other things, wrongfully repudiating the Contract, as described herein.

> **Answer**: BlackFem denies the allegations in Paragraph 67. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

68.    Defendants' breaches of the implied covenant of good faith and fair dealing damaged the City in an amount to be proven at trial but reasonably believed to be in excess of $50,000.

**Answer**: BlackFem denies the allegations in Paragraph 68. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

## COUNT IV
## DECLARATORY JUDGMENT

69.    The City restates and realleges all previous paragraphs of this pleading.

**Answer**: BlackFem incorporates its responses to all previous paragraphs.

70.    There is a real and justiciable controversy between the City and Defendants regarding the parties' rights arising out of and related to the Contract.

**Answer**: BlackFem admits there is a real and justiciable controversy between the City and BlackFem regarding the parties' rights arising out of and related to the Contract. Defendants affirmatively state that The 10Seven Project and 10Seven, LLC are not parties to the Contract, therefore denies that there is controversy between them and the City.

71.    The Uniform Declaratory Judgments Act as set forth in Minn. Stat. § 555.01-555.16 grants courts the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.

**Answer**: Paragraph 71 sets forth an assertion of law to which no responsive pleading is required.

72.    The Uniform Declaratory Judgements Act also permits any party to a written contract to obtain a declaration of that party's rights arising under the contract, and to construe the contract either before or after the contract has been breached.

**Answer**: Paragraph 72 sets forth an assertion of law to which no responsive pleading is required.

73.    The City is entitled to a judicial declaration that:

   a.    Defendants materially breached the Contract;
   b.    The City's contractual obligations are discharged by

18

Defendants' material breach;

c. Pursuant to the terms of the Contract, the City holds all right, title, and interest in the Curriculum for the In-School, After-School, and In- Community programs created to-date pursuant to the Contract.

**Answer**: BlackFem denies the allegations in Paragraph 73. BlackFem affirmatively states that the only parties to the Contract are the City and BlackFem.

## COUNT V
## UNJUST ENRICHMENT

74.    The City restates and realleges all previous paragraphs of this pleading.

**Answer**: BlackFem incorporates its responses to all previous paragraphs.

75.    In the alternative to the breach of contract claims, the City alleges that, on information and belief, Defendants intend to keep the $900,000 that the City paid to BlackFem, despite failing to perform the work and to give the City the deliverables, free of unreasonable restrictions, contemplated by the Contract.

**Answer**: BlackFem denies the allegations in Paragraph 75. BlackFem affirmatively states that The 10Seven Project and 10Seven did not receive any payment from the City.

76.    By retaining the City's payments without performing its obligations under the contract, Defendants have retained a benefit that is not legally justifiable and have been unjustly enriched.

**Answer**: BlackFem denies the allegations in Paragraph 76. BlackFem affirmatively states that The 10Seven Project and 10Seven did not receive any payment from the City.

77.    As a direct and proximate result of Defendants' inequitable conduct, the City has suffered and is entitled to restitution in an amount greater than $50,000, the specific amount to be determined at trial.

**Answer**: BlackFem denies the allegations in Paragraph 77. BlackFem affirmatively states that The 10Seven Project and 10Seven did not receive any payment from the City.

### FIRST AFFIRMATIVE DEFENSE

Count V of the Complaint, Unjust Enrichment, fails to state a claim for which relief may be granted because the legal relationship between the City and BlackFem is governed by a contract.

### COUNTERCLAIM

For its counterclaim against the City of St. Paul, BlackFem alleges as follows:

1.      BlackFem is a non-profit corporation organized under the laws of New York, with its principal place of business in Maryland. BlackFem partners and contracts with local governments and school districts to, among other things, develop client-tailored curricula to develop financial knowledge and opportunities for wealth justice.

2.      The City of Saint Paul is a municipal corporation organized and existing under the laws of the State of Minnesota.

3.      The City's Office of Financial Empowerment has developed and launched a program it calls CollegeBound Saint Paul, a citywide program aimed at illuminating a pathway to a brighter future by connecting kids and families to financial services and education and promoting a citywide college-going culture.

4.      OFE staff members heard BlackFem founder Chloe McKenzie's keynote address at the Midwest Asset Building Conference in 2022. In February 2023, Muneer Karcher-Ramos – then the director of OFE – emailed BlackFem, stating that "our team is

intrigued by the concepts of wealth justice and financial trauma, and have studied Chloe's papers" and that "the City of St. Paul is interested in learning more about The Wealth Rise Model and what that could look like to implement in St. Paul."

5.     Through the rest of 2023 and into early 2024, the City and BlackFem engaged in ongoing discussions over ways in which BlackFem could work with the City and its CollegeBound program. BlackFem explained on multiple occasions beginning at least as early as March 2023 that the curricula would be based on and include intellectual property owned by BlackFem and its partners, along with portions specifically crafted or tailored to the needs of the populations to be served in St. Paul.

6.     As BlackFem explained, most of the material in the curricula would be pre-existing intellectual property that would not be transferred to the City. BlackFem and the City discussed licensing options that would permit the City to use the curricula with its community partners on an ongoing basis.

7.     In 2024, CollegeBound released its Elementary Blueprint, a set of community-created recommendations for implementing CollegeBound's vision. One of three goals the Blueprint focused on was whole family wealth literacy. The Blueprint envisioned teaching wealth literacy for the whole family through three approaches: (1) in schools, (2) after school, and (3) in the community. The City based this concept of wealth literacy on the work of BlackFem and McKenzie, acknowledging in its promotional materials that the wealth literacy concept "was envisioned and adapted based on conversations with and presentations by Chloe B. McKenzie at BlackFem, who coined

the concept and practice of wealth justice."

8.     On February 7, 2024, the City issued a Request for Proposal to, among other things, find a consultant to develop in-school, after-school and in-community curricula for pre-K to 5th grade wealth literacy curricula for pre-kindergarten through 5th grade students and their families. The RFP was based on the work the City and BlackFem had done together over the prior year.

9.     BlackFem responded to the RFP, and BlackFem and the City entered into a contract under the City would pay BlackFem $1 million for development of kindergarten through 5th grade curricula based on BlackFem's WealthRise model (the "Contract"). Initially the City told BlackFem that project work would start in May 2024. However, due to delays by the City the Contract was not finalized until August 2024, and the City did not provide a copy of the Contract for signature until September 4, 2024.

10.    BlackFem immediately began working with the City and its community partners, including staff at St. Paul Public Schools, to develop the accreditation rubric and training required for school, in-community, and after-school partners to teach and implement the program; interview school/partners and conduct research in order to develop a Saint Paul-specific curriculum; and work with the school and community partners to create a working timeline, among other work necessary to launch this multi-faceted program, including development of the technological infrastructure to be employed to deliver the digital content. All work was subject to availability of the individuals involved, training status, and the City's edits and approvals of the materials

and timelines.

11.     Work on the project progressed on the timeline authored by the City without significant issues until May 2025.

12.     In May 2025, staff in the City's OFE began making demands that were inconsistent with the terms of the Contract. This included a demand that BlackFem stop work tailoring curricula to the St. Paul community and instead that BlackFem simply give the City its underlying core curricula.

13.     In June 2025, the City's OFE began signaling their intention to permit third parties who were not parties to the Contract (namely, Saint Paul Public School teachers) to make changes to the curriculum. These proposed changes included altering the sequence of lessons, removing materials, and otherwise tailoring content. The City justified these actions by stating that routing such changes to BlackFem's content through BlackFem would have made BlackFem an "onerous middleman."

14.     In a June 25, 2025, letter, the City's attorney asserted that the Contract entitled the City to all right, title and interest in the entirety of "the wealth literacy lesson plans, student-facing materials, caregiver-facing materials and any other supplemental materials ('Educational Documents')" created by BlackFem under the Contract – including all of the WealthRise intellectual property – and that BlackFem would retain no right, title, or interest in those materials.

15.     In a July 29, 2025, letter, the City's attorney acknowledged that what she had deemed the "Educational Documents" would be "adapted from BlackFem's

WealthRise program, and may incorporate elements of [BlackFem's] intellectual property," but continued to insist that "BlackFem agreed to transfer ownership of all resulting Educational Documents to the City."

16.     In sum, the City insists – contrary to the terms of the Contract – that a) it is entitled to ownership of a final work product that includes intellectual property developed and owned by BlackFem and/or individuals, companies, and institutions partnering or working with BlackFem; and b) the City will have a right to copy, distribute, modify, or make derivative works from that work product as it desires.

17.     The Contract does not grant such ownership or rights to the City. While the contract does state that "work product" – as defined in the contract – "will become the property of the City after final payment is made," the Contract makes clear that "work product" does not include any of BlackFem's intellectual property:

> a.  Section 8 of the Contract defines "work product" as any report, recommendation, paper, presentation, drawing, demonstration, or other materials, whether in written, electronic, or other format that results *solely* from Contractor's Services under this Agreement." (emphasis added)
>
> b.  Section 8(A) of the Contract states in relevant part that "Contractor retains the right to all its software, intellectual property and templates that are not a Service specific deliverable as well as to individual features of the design which Contractor would reasonably expect to be able to recreate in whole or in part in other projects."

18.     As BlackFem has explained to the City, the Contract entitles the City to the equivalent of a copy of a textbook – delivered in the form of a locked, non-editable PDF – that it may use internally with and for the CollegeBound program. The City may share

that locked PDF with other properly accredited partners only with permission of BlackFem, the holder of the rights to the underlying intellectual property that comprises the majority of the content. The contract does not make the City an owner of BlackFem's WealthRise program or of any of the other pre-existing intellectual property BlackFem employed to develop and draft the work product prepared for and tailored to the St. Paul community.

## COUNT I – DECLARATORY JUDGMENT

19.    Under the Declaratory Judgments Act, 28 U.S.C. § 2201-2201, when an actual controversy arises between parties, a United States District Court "may declare the rights and other legal relations of any interested party seeking such declaration."

20.    An actual controversy exists between BlackFem and the City, as set forth in the preceding paragraphs.

21.    BlackFem is entitled to a declaration that under the Contract:

    a.  The "work product" and "supporting documents" over which the City is entitled to full ownership are comprised of and limited to the tailored enhancements developed for use specifically by St. Paul educators as part of the CollegeBound St. Paul Elementary Plan.

    b.  "Work product" and "supporting documents" do not include the pre-existing components of BlackFem's WealthRise curriculum or any other materials or works developed outside of the work BlackFem performed specifically and solely under the parties' contract. The WealthRise curriculum and trademark remain the property of BlackFem, and the City does not have a right to copy or distribute, or create derivative works based on, the curriculum or any of BlackFem's software, intellectual property, or templates that were not specifically created for the City within the scope of the parties' contract.

    c. BlackFem has not breached its obligations and is entitled to payment of the $1 million the City agreed to pay for BlackFem's work.

## PRAYER FOR RELIEF

Based on the above, BlackFem respectfully asks that the Court enter judgment:

1. Dismissing the City's claims with prejudice.

2. Declaring that:

    a. The "work product" and "supporting documents" over which the City is entitled to full ownership under the Contract are comprised of and limited to the tailored enhancements developed by BlackFem for use specifically by St. Paul educators as part of the CollegeBound St. Paul Elementary Plan.

    b. "Work product" and "supporting documents" under the Contract do not include the pre-existing components of BlackFem's WealthRise curriculum or any other materials or works developed outside of the work BlackFem performed specifically and solely under the parties' contract. The WealthRise curriculum and trademark remain the property of BlackFem, and the City does not have a right to copy or distribute, or create derivative works based on, the curriculum or any of BlackFem's software, intellectual property, or templates that were not specifically created for the City within the scope of the parties' contract.

    c. BlackFem has not breached its obligations under the Contract and is entitled to payment of the $1 million the City agreed to pay for BlackFem's work.

3. Awarding BlackFem its court costs.

4. Granting such other relief as the Court finds just and equitable.

Dated: October 30, 2025

RUBRIC LEGAL LLC

   /s/ Chad A Snyder
Chad A. Snyder (#288275)
Michael H. Frasier (#387704)
111 3rd Ave. S – Suite 110
Minneapolis, MN 55401
612.465.0074
chad@rubriclegal.com
michael@rubriclegal.com

Attorneys for Defendants